IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID ALLEN REINHARDT,

   Plaintiff,

   v.

LAWRENCE J. HOGAN, JR.,
BOYD K. RUTHERFORD,
ROBERT L. GREEN,
WAYNE HILL,
WALTER WEST,
WALTER HOLMES,

   Defendants.

Civil Action No.: DKC-20-1011

## MEMORANDUM OPINION

On May 13, 2020, Plaintiff David Allen Reinhardt filed his supplemental complaint (ECF No. 8) in response to this court's May 8, 2020 Order (ECF No. 7). Mr. Reinhardt was directed by the court to explain "how he specifically is adversely affected by any failures to observe the safety measures in place and identifying how each of the named Defendants have engaged in conduct designed to harm him or to create an unacceptable level of risk to his health." ECF No. 7 at 4. Additionally, this court observed that there are currently extensive measures in place to protect the inmate population at Eastern Correctional Institution ("ECI") from infection with COVID-19 and directed Mr. Reinhardt to describe the steps "he has taken to inform officials at ECI of any failures to implement the safety guidelines currently in place at ECI." *Id*. at 4-5. For the reasons stated herein, the court grants Mr. Reinhardt's motion to proceed *in forma pauperis* (ECF No. 2), grants his motion to amend (ECF No. 17), denies his motion to appoint counsel (ECF No. 18), denies injunctive relief, and dismisses the complaint.

**I.      Non-Dispositive Motions**

In his motion to amend (ECF No. 17), Plaintiff seeks to change the amount of damages he seeks, engage in settlement negotiations, and raise claims regarding the transfer of inmates to ECI during the pandemic.  Because the motion does not change the nature of his claims, it shall be granted.

Plaintiff filed a motion to appoint counsel on January 7, 2021.  ECF No. 18.  He cites his incarceration and the likelihood of any litigation in this matter being complex as grounds for the motion. *Id*.  A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one and may be considered where an indigent claimant presents exceptional circumstances.  *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982).  There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances."  *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987).  Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it."  *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by *Mallard v. U.S. Dist. Ct*., 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel).  Exceptional circumstances include a litigant who "is barely able to read or write," *Whisenant* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008).  Upon careful consideration of the motions and previous filings by plaintiff, the court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so.  No exceptional circumstances exist that warrant the appointment of an attorney to represent plaintiff under § 1915(e)(1).  The motion to appoint counsel shall be denied.

## II.     Division of Correction's Initial Response

This court noted the following safety measures in place at ECI:

"To date only one confirmed case of COVID-19 in an employee at ECI has occurred and that employee did not work inside the perimeter fence, wore personal protective equipment (PPE) while working, and had no close contact with other correctional staff or inmates.  The employees who work in the same department as that employee also wore PPE.  ECF No. 5-1 at 1, ¶ 3 (Decl. of Warden West), *see also* ECF No. 5-1 at 6 (April 30, 2020 Memorandum).

Intake of prisoners, by transfer or parole retake warrants, ceased at ECI and ECI-Annex as of April 23, 2020.  ECF No. 5-1 at 1, ¶ 3.

On March 19, 2020, ECI implemented "modified movement of inmates including social distancing and sanitation efforts."  *Id.* at 2, ¶ 5.  ECI inmates remain on "modified movement." *Id., see also* ECF No. 5-1 at 10 (March 31, 2020 Sec. Dir. No. EmD.DPSCS.055.0012).

On April 20, 2020, all ECI inmates were provided with "washable cloth sneeze guards, which cover the nose and mouth."  ECF No. 5-1 at 2, ¶ 5.

Sanitation supplies, which includes disinfectant, are provided to inmates weekly so they can clean their cells.  ECF No. 5-1 at 2, ¶ 5.  Requests for additional cleaning supplies are handled by the housing unit manager.  *Id*.

Inmates who are assigned to general population, which includes Reinhardt, are being fed in their cells using Styrofoam trays delivered by correctional officers.  ECF No. 5-1 at 2, ¶ 5.

A "Social Distancing Modified Recreation" schedule has been implemented.  Both the East and West compound courtyards are closed; general population inmates are permitted indoor recreation.  No more than 10 inmates at a time are released from their cells to the dayroom "for one hour on rotating days."  "After each recreation period the recreation area is sanitized with a focus on the telephones, tables, showers and door handles."  ECF No. 5-1 at 2, ¶ 5, *see also id.* at 24 (March 23, 2020 Memo directing immediate implementation of social distancing).

Each cell at ECI has hot and cold running water and inmates are provided with soap free of charge.  ECF No. 5-1 at 2, ¶ 6.  In Mr. Reinhardt's housing unit, showers are provided on a rotating basis to allow for social distancing and the showers are cleaned between each group.  *Id.*  Laundry services are also provided in each housing unit.  *Id*.

Currently co-pays for sick calls are suspended.  Medical staff make three daily visits to each tier and cell in Mr. Reinhardt's housing unit to determine if there are any medical concerns.  ECF No. 5-1 at 2, ¶ 7.  Inmates can submit a sick call slip to nursing staff while they are in the housing unit during pill call or they can request services when they are otherwise in contact with nursing staff.  *Id*.  Pill call is done by nursing staff on a daily basis in the housing units with no more than 10 inmates at a time being seen.  *Id*.  When an inmate displays flu-like symptoms, the policy states he "will be isolated from the population and sheltered in place" with medical evaluation taking place as soon as possible.  *Id*. at ¶ 8.  If medically necessary, the inmate will be transported to Peninsula Regional Medical Center (PRMC) for testing and treatment.  *Id*., *see also* ECF No. 5-1 at 13-14 (Guidelines for medical isolation and quarantine).

When correctional staff enter ECI they are required to practice social distancing. ECF No. 5-1 at 3, ¶ 9.  The lobby, intake areas and transportation vehicles were "deeply cleaned and sanitized" by third-party vendors described as "expert in cleaning."  *Id*.  No more than 10 people are allowed in the lobby area at any given time; staff performing pat downs change their gloves between each pat down; surfaces and countertops are cleaned multiple times per day; and all personnel are required to have their temperature taken each day before they enter the prison. *Id*.  Anyone arriving at ECI with a temperature of 100.4 or above is "evaluated and sent home."  *Id*.  Staff are also required to wear a facemask and face shield or goggles before entering the prison.  *Id*.  While in the facility, correctional staff are required to wear sneeze guards, face shields, and gloves.  *Id*. at ¶ 10.

Due to the limited supply of COVID-19 tests, testing of inmates at ECI who display flu-like symptoms is ordered by medical providers at PRMC.  ECF No. 5-1 at 3, ¶ 13.  According to Dr. Baucom, the DPSCS received "a couple hundred testing kits" from the Maryland Department of Health the week of April 27, 2020. ECF 5-2 at 2, ¶ 5 (Decl. of Sharon Baucom, M.D.).  She adds that the "kits are in the process of being dispensed to those DPSCS facilities with the most COVID-19 suspected cases."  *Id*.  Dr. Baucom has directed, based on generally accepted medical practices, that "priority for COVID-19 testing should be given to symptomatic individuals who are $\geq$60 years or have chronic medical conditions and/or an immunocompromised state that may put them at higher risk for poor outcomes."  *Id*. at ¶ 4.

In regard to his health, Mr. Reinhardt's medical records indicate that his "last nurse sick call was October 20, 2019 for low back pain."  ECF No. 5-1 at 4, ¶ 15. He is being treated for lower back pain and does not have any of the chronic health conditions that put him at higher risk for a poor outcome if infected with the virus.  *Id*.  Mr. Reinhardt does not qualify for early release under Governor's Executive Order 20-04-18-01; he is serving a life sentence for murder.  *See* ECF 5-1 at 29 ¶ b(iii) (Gov. Order excluding from early release inmates convicted of a crime of violence)."

4

ECF No. 7 at 1-4 (footnote omitted).

### III. Supplemental Complaints

In his supplemental complaint, Mr. Reinhardt asserts that Defendants Governor Hogan, Lt. Governor Rutherford, Secretary of Public Safety Green, Commissioner Hill, Warden West, and Assistant Warden Holmes all failed to take immediate actions to protect Mr. Reinhardt's life when, on or about January 1, 2020, the COVID-19 virus first appeared in the United States. ECF No. 8 at 1. Mr. Reinhardt characterizes this asserted failure to act as "warfare against my person" and states that the position that he was "safe" because he is incarcerated is false due to the fact that no measures were taken to protect correctional and support personnel "from the start." *Id*. Mr. Reinhardt expresses his dismay that when Governor Hogan issued the stay at home order he did not enact "some type of protection for me being incarcerated." *Id*. He describes a lack of concern for persons incarcerated and states that it is this apparent apathy for his well-being that causes him fear-induced insomnia and nightmares. *Id*. at 2. According to Mr. Reinhardt's view, it does not matter whether "it is deliberate indifference or not it is the defendants' obligation to provide me with every human right to be protected from harm no matter what harm it may be!" *Id*. He provides a timeline of events as further basis for his complaint. *Id*. at 3-4.

On April 6, 2020, social distancing was started at ECI, limiting recreation halls to 10 men at a time. ECF No. 8 at 3. Mr. Reinhardt observes that this measure was put into place 97 days after COVID-19 "enters U.S.A." *Id*.

Around April 8 through 10, 2020, Mr. Reinhardt claims that Officer V. Sutton reported to him that when her temperature was taken before coming into the prison that day it read 74 degrees. ECF No. 8 at 4. Mr. Reinhardt speculates that this report by Sutton is indicative of either faulty equipment or improper training. *Id*. At the same approximate time, correctional officer Brown

5

told Mr. Reinhardt that staff are having their temperatures taken by either a lieutenant or another correctional officer. *Id*. Mr. Reinhardt opines that if these officers are not medically trained then this practice "violates medical protocol." *Id*. He adds that "CO A. Brown also told me that they only sanitize their hands up to their elbows" and that nothing is done for their uniforms. *Id*.

On April 11, 2020, the Baltimore Sun reported 57 cases of COVID-19 in the Maryland Correctional System. ECF No. 8 at 3.

On April 15, 2020, an inmate confined to Jessup Correctional Institution, described as a 60 year-old man, died after contracting COVID-19. *Id*.

On April 16, 2020, Sgt. Stevens from the Eastern compound of ECI told a news reporter from WMDT-47 that correctional officers need more personal protective equipment (PPE). *Id*. Mr. Reinhardt adds his editorial comment indicating that Sgt. Stevens' concern somehow means that he believes the inmate population poses a threat of infection for the officers. *Id*. On the same day, Mr. Reinhardt states that The Daily Times reported that Maryland has failed to protect correctional staff properly, but there is no mention of the inmate population. *Id*.

On April 17, 2020, Lt. Trador, Officer Diggs, Sgt. Barkley, and Sgt. Wilson violated the 10 man limit for the recreation hall in housing unit 7 by allowing 20 men to go into the area together. *Id*. Mr. Reinhardt states that Chief of Security Brittenham came to the housing unit and made the officers lock the unit down. *Id*.

On April 18, 2020, Sgt. Barkley ordered the "shower men" in Mr. Reinhardt's housing unit to "wipe down the showers, do not scrub or clean thoroughly." *Id*. The order was given over the intercom and was therefore heard by all the inmates in the housing unit. *Id*.

On April 19, 2020, Sgt. Barkley allowed 11 men in the recreation hall area, instead of 10. *Id*.

On April 20, 2020, the inmate population at ECI received "masks made by MCE from uniforms."  *Id*.  Mr. Reinhardt states these were distributed "111 days later" referring to his estimation that the pandemic crisis began on January 1, 2020.  *Id*.

On April 24, 2020, Sgt. Stevens announced over the intercom that inmates were to "stand by for bleach/disinfectant" but it was never distributed.  *Id*.  Mr. Reinhardt characterizes this as "psychological warfare."  *Id*.

On April 29, 2020, the "second incarcerated person in Maryland Correctional System die[d] at Jessup Correctional Institution."  *Id*.  Mr. Reinhardt states that a correctional officer told him that "COVID-19 has entered the Mail Room" of ECI.  *Id*.  He states that "[t]he Administration" doesn't share information with either the inmates or the staff.  *Id*.

On May 6, 2020, Mr. Reinhardt states that the "Administration" put up signs mandating staff wear mask, gloves, and face-shields at all times.  ECF No. 8 at 4.  Although the notices initially indicated that inmates' use of masks in common areas was voluntary, it was later made mandatory.  *Id*.  Mr. Reinhardt notes that this occurred on the same day he received mail from this court.  *Id*.

On May 7, 2020, Mr. Reinhardt states that he was given cleaning supplies to clean his cell and to clean the shower.  ECF No. 8 at 4.

In subsequently filed supplemental complaints and a motion to amend the complaint, Mr. Reinhardt seeks to negotiate a settlement with Defendants and to amend the amount of damages he seeks.  He states he is willing to dismiss this lawsuit if Governor Hogan issues him a full pardon, he is given transportation to his new home, and he is given a monetary award of 60 million dollars.  ECF Nos. 11, 12, 16 and 17.

**IV.     Injunctive Relief**

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at, 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

The crux of Mr. Reinhardt's complaint is that safety measures were not put into place soon enough after the news media reported the first COVID-19 infection in the United States. ECF No. 8 at 1. To the extent that correctional officials were under an obligation to implement precautionary measures before any danger to the American general public was even recognized, injunctive relief will not correct that past failure. Mr. Reinhardt was provided the opportunity to describe to this court what, if any, failures to implement the safety measures had occurred and to

whom he had reported those failures.  He describes two isolated incidents involving a failure to observe the limit of 10 inmates in the common areas.  *See* ECF No. 8 at 3.  One incident involved allowing eleven inmates in the common area and the second involved allowing 20 inmates to be in the area together.  In the case of the second incident, Mr. Reinhardt admits a lieutenant corrected the situation.  Mr. Reinhardt's complaint as supplemented fails to satisfy the prerequisites for an award of injunctive relief.  There is no likelihood of irreparable harm present where, as here, there is ample evidence that policies and procedures have been put into place for the very purpose of protecting the inmate population at ECI from exposure to COVID-19.  The speculative nature of Mr. Reinhardt's stated fears and concerns are insufficient to warrant the extraordinary relief of an injunction.

**V.     Claim for Damages**

In addition to injunctive relief, Mr. Reinhardt seeks 60 million dollars in damages.  ECF No. 17 at 2.  Mr. Reinhardt's complaint is subject to screening under 28 U.S.C. § 1915A which requires prisoner complaints to be dismissed when it appears the complaint is "frivolous, malicious or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).  "Whether the suit alleges significant or de minimis damages is among the many factors a district court may take into account in determining the frivolousness of a claim." *Nagy v. FMC Butner*, 376 F.3d 252, 257 (4th Cir. 2004).

A violation of the Eighth Amendment's proscription against the imposition of cruel and unusual punishment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  The Eighth Amendment is violated when an inmate is subjected to "unnecessary and wanton infliction of pain." *Estelle v.*

*Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  To establish an Eighth Amendment violation, an inmate must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation.  *Williams*, 77 F.3d at 761.  Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

There must be some indication that the objectively serious deprivation was the result of intentional conduct or refusal to act.  *See Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted).  "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

Mr. Reinhardt claims in his motion to amend that he became aware on November 19, 2020, that inmates with COVID-19 were transferred to ECI without first being tested for the virus.  ECF No. 17 at 1.  He claims these inmates were placed in the gymnasium at ECI and allowing them to be transferred during a pandemic endangered the physical and mental health of the general population at ECI.  *Id*. at 1-2.  He adds that the gym is supposed to be reserved for the inmate population for "our/my exercise which is not taken because these Defendants are not concerned about anything other than money." *Id*. at 2.

Mr. Reinhardt further alleges that on November 20, 2020, the general population was placed on 30-minute recreation time for use of the phones and to shower because of the inmates

who were transferred to ECI before being tested for COVID-19.  *Id*.  He also claims that there is no "deep cleaning taking place at ECI in housing Unit 7."  *Id*.

Taken as true, Mr. Reinhardt's allegations do not amount to a disregard for his or any other inmate's safety at ECI.  Rather, when the risks posed by COVID-19 became known to the named Defendants, those risks were not ignored.  Measures were quickly implemented to limit exposure to the virus by the inmate population at ECI as soon as was practicable and were in place when the instant complaint was filed.  Mr. Reinhardt's description of the mental stress he has experienced in light of the media coverage regarding the spread of the virus and the rising death rate, while unfortunate, is not evidence of a serious injury sufficient to sustain a constitutional claim.  With regard to the transfer of inmates to ECI, Mr. Reinhardt admits these inmates were isolated from the general population and cites no injury resulting from that practice.  Further, the loss of the use of the gymnasium does not represent a loss of a constitutionally guaranteed activity.  The Eighth Amendment is not violated when every conceivable protective measure is put into place to prevent the spread of a contagious disease and there are isolated lapses in implementation that cause no injuries.  *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) (claims of negligence are the province of state law and do not support a constitutional claim).  The complaint fails to state a claim and must be dismissed.

A separate Order follows.


January 11, 2021                                               /s/
                                                    DEBORAH K. CHASANOW
                                                    United States District Judge